[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT(#150)
CT Page 5316-PP
Pursuant to Practice Book Section 321 and in accordance with its motion for a directed verdict, the defendant Norden Systems, Inc., ("Norden") is moving for a judgment in its favor notwithstanding the verdict returned (#150) on March 11, 1996.
The plaintiff Anthony Chieffalo sued the defendant Norden in a three count complaint claiming that his employment with the defendant was wrongfully terminated and that the manner in which he was discharged negligently inflicted upon him emotional distress. The jury after listening for five days with exhibits introduced, returned a general verdict for the plaintiff in the sum of $141,216 economic damages plus $25,000 for emotional distress. The verdict was accepted by the court. The defendant then moved to have the verdict set aside and for a remittitur. The defendant also moved for judgment notwithstanding the verdict. The court denied the motion to set the verdict aside, denied the request for a remittitur and informed the attorneys that the court wished to review the trial transcripts of evidence as it related to emotional distress before it ruled upon the motion for judgment notwithstanding the verdict (as related to emotional distress). The transcripts were submitted to the court in due time and the issue was heard on September 3, 1996.
A. AS TO COUNT ONE (CONTRACT CLAIM).
The court believes that there was ample evidence before the jury to determine that the plaintiff had a contract with the defendant which prohibited the defendant Norden from terminating the plaintiff's employment without just cause. The court finds that there is no legal reason for it to interfere with the jury's finding on economic damages. Therefore, the defendant's motion for judgment as to economic damages is denied. Judgment may enter for the plaintiff upon the verdict for economic damages as found by the jury.
B. AS TO NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS.
The law in this case is quite clear. A trial court may set aside a verdict on a finding that the verdict is manifestly unjust because, given the evidence presented, the jury, mistakenly applied a legal principle or because there is no evidence to which the legal principles of the case could be CT Page 5316-QQ applied. Maroun v. Tarro. 35 Conn. App. 391, 396 (1994). In the employment context, negligent infliction of emotional distress must involve unreasonable conduct in the termination process. It may arise only where the defendant knew or should have known that its conduct in the termination process involved an unreasonable risk of causing emotional distress that might result in illness or bodily harm.
After reading the actual trial transcripts as to the evidence on this issue (see the transcripts attached hereto and incorporated herein) the court can find no evidence to support a finding by the jury of unreasonableness in the manner that the plaintiff was terminated. The trial record is void of any evidence, either direct or circumstantial, that is necessary to support the jury's finding. On the evidence presented the jury could not "reasonably and legally have reached their conclusions." There was no evidence that the manner of the plaintiff's termination from employment was different in any way from the usual termination of employment or that it was done in any way that would cause anything more than the normal upset that would result from any termination of employment. There was no evidence to prove that the defendant knew or should have known, that its conduct in the termination process, involved an unreasonable risk of causing emotional distress that might result in illness or bodily harm.
In accordance with Section 321 of the Practice Book and this motion for judgment, the court finds for the defendant on its motion for a directed verdict as to the third count of the complaint and grants the defendant's motion for judgment on that count.
A review of the trial court's file indicates that there was confusion as to the entering of a judgment prior to the date of this memorandum of decision. The court had advised the attorneys that no judgment was intended to enter upon the verdict until this issue was ruled upon once the actual trial transcript could be reviewed.
Also as to the second count, since the jury found against the defendant, judgment on that count may enter for the defendant.
Judgment may enter on count one for economic damages in the amount of $141,216 plus interest from the date of the verdict together with statutory costs. Judgment may enter on the second CT Page 5316-RR and third count for the defendant.
RYAN J.
A Yes.
Q Could you describe the circumstances of how that meeting occurred?
A Yes. I was working on a problem with one of my direct reports, John Kenworthy, and he called me into his office.
Q Who called you into his office?
A John Mercurio called me into his office.
Q And at about what time was that during that day, March 26th?
A Approximately 10:00, 10:30, in that time frame.
Q And at, that time what was said by you and what was said by Mr. Mercurio?
A John Mercurio told me that he was going to repeat, what he had told me the night before, that, he wanted me to work on the Artemis project. I stated I had no problem working on the Artemis project, and he stated that he wanted me to report, to Jerry Beauchamp, and at that time I said "I told you I would be calling your boss Mr. Ritter. I came in this morning and I have a phone call in to Mr. Ritter right now. He has not called me back yet. As soon as he does I'll let you know."
And at that time he — at that point he said that he was going to terminate me for insubordination and I told him he was not being insubordinate, I had no problem working on the project, I did have a question as to whether or not I had been demoted because I was no longer reporting to John Mercurio, the manager, but Jerry Beauchamp which I was not sure what his title was, but I was not concerned with Jerry Beauchamp's title, I was concerned with my title and whether or not my pay had or would be affected. So I only asked to speak to John Ritter, which, you know, I called him immediately, I called him by 8:30 that morning.
Q And — CT Page 5316-SS
A And he was not, available. His secretary told me, "Tony, John's not available. As soon as he gets out of the meeting," meaning John Ritter, "I'll have him call you." I was waiting for the phone call when John Mercurio called me about 10:00 to 10:30.
Q Now before March of 1992 wasn't, Bob Pilot, his immediate supervisor or the immediate manager for Mr. Mercurio?
A Yes. Approximately two weeks prior to March 26th Bob Pilot had retired. He was no longer with the company. He had been gone approximately two to four weeks.
Q And who took Mr. Pilot's place?
A No one had been named, and as a result John Mercurio was reporting directly to John Ritter as much as I was reporting to Bob Pilot at one point when Frank Marini was not there.
Q Okay.
A So he was a direct report of John Ritter's.
Q And in this meeting at approximately 10:30 in the morning with Mr. Mercurio he mentioned termination?
A Yes. I believe that's the first time it had ever been mentioned to me.
Q By Mr. Mercurio?
A By Mr. Mercurio — by anyone.
Q Okay. And what specifically was said, if you recall, by Mr. Mercurio concerning termination?
A That I had to take that assignment and work for Jerry Beauchamp, report to Jerry Beauchamp, or I would have to resign or he would terminate, he would fire me.
Q was anyone else present at, the time of that. discussion with Mr. —
A That, initial discussion, no. It was just he and I. CT Page 5316-TT
Q Okay. So what was your response to resign, work on the project for Mr. Beauchamp or be terminated?
A I told him I had no problem working on, the project. I told him I would not resign. There was no reason for me to resign. And I did have a phone call to his superior and I wanted to find out whether or not I was demoted.
Q Okay. And did Mr. Mercurio have a response to that?
A I believe he may have mumbled that Ritter was not going to be calling me.
Q Okay. And what else, if anything, was said during that discussion?
A He again told me again "You're either going to accept that assignment, work for Jerry, or you're going to resign," and I told him I would not resign, there was no reason to resign, and that I had the phone call in to John Ritter —
Q And so how did that conversation end?
A — and that's what I was waiting for.
Q How did that conversation end?
A He told me at that point that he had no alternative but to fire me, and he gave me twenty minutes, clean out my desk, and that he was going to be terminating, that he would terminate, so I cleaned out my desk, went and cleaned out my desk.
Q So you left his office —
A left his office, I went and cleaned out my desk, and approximately fifteen, twenty minutes later I said, "Okay, John, I'm ready."
Q You went back to his office?
A Yes. To tell him. He told me "When you're finished let me know." So I went back to his office and I told him I'd taken my personal items, what do you want me to, do next. CT Page 5316-UU
Q And what did Mr. Mercurio say?
A He told me to go back into his office because he needed a witness.
Q Did he explain what he needed a witness for?
A Only that he needed a witness.
Q So you went back into his office?
A Yes.
Q And what happened next?
A Bill Patanicky was either in the office or was called in the office and he became the witness for Mr. Mercurio.
Q And what was said? Was anything else said at that, time when Mr. Patanicky came into the room?
A John Mercurio stated again what he had told me earlier.
Q Which was what?
A After he repeated those and Bill Patanicky had been the witness, he said okay, and I believed he was going to be taking me to Personnel. I had asked at one point, I dont't recall exactly when within the conversation, "I wish to speak to someone at Norden about my situation," and I believed he was taking me to Personnel.
Q Did Mr. Patanicky have any participation in the conversation?
A No, none at all. He was only there to hear and view what occurred.
Q Okay. At any point in time during the two conversations you had that morning with Mr. Mercurio, did either one of you raise your voice or shout?
A No. CT Page 5316-VV
Q And how about the evening before, on March 25th, did either one of you raise your voices at that point in time?
A No.
Q Okay. What, if anything, happened next after that conversation with Mr. Patanicky watching?
A He told me that he was ready and to gather up my things, and I did, and I thought he would be taking me to Personnel.
Q And so what happened next?
A He started to — we started together to go out. There was a — our office was somewhat like this room here with several offices inside and there was one exit and we went out that exit, and then there was a main corridor leading towards the Personnel Office and I thought that he'd be taking me out in that direction. In reality we went in the opposite direction which was to the rear gate of the main facility in Norwalk.
Q Well, was anything said during that walk?
A I said to him, "Where are you taking me," you know. He said, "Well, I'm escorting you out," and I said, "Well, if you're going to do that," it was either cold or raining, "my care is totally on the opposite side on the other level, because the way Norden is built it's like three leveled. We were down in actually the basement level and he was walking me out the closest exit and my car was totally on the opposite end, which is what they call the west gate as opposed to the east gate, and I said "If you're not going to walk me to Personnel, if you could at least walk me to my car so I don't have to walk all the way around the building," which he acknowledged and he did. We turned around and continued down the corridor up a flight of stairs to get on to the main level and he continued to walk me to the west gate and we got to the guard. He took my badge, and that was it.
Q Did he give you any pieces of paper or any documents at any point in time after he mentioned the word termination?
A Nothing at all. Nothing.
Q Okay. From the moment you gathered your belongings that CT Page 5316-WW morning and walked into his office was anyone else in addition to Mr. Patanicky present to observe what went on?
A No
Q No one else?
A No.
Q As you —
A A few individuals did find out that I had been fired. There was an individual I was working with. He was not aware of the conversations. They took place in a closed office, but when he saw me walk back, because I had been working with him, he thought I wold be going back to work with him, and instead he saw me cleaning out my desk because he was on the other side, and he said, "What happened?" And I said "I've just been fired."
Q Did anyone else observe you cleaning out your desk and walking out with Mr. —
A One or two individuals initially, and as he was walking me out, again, because it was individual cubicles and office within one big office, most of the individuals which were approximately twenty would have seen me being walked out that door.
Q What makes you think — what made you think that you were going to go to Personnel with Mr. Mercurio?
A I had asked. In all my years at Norden that's the way I was told people were terminated. I myself had terminated someone back in 1970, in that nature. I never saw anyone be escorted out in effect the back door the way I was, so it was new to me.
Q Where you surprised?
A Totally surprised. I certainly did not go in that day thinking that I was going to be terminated.
Q So termination wasn't a word Mr. Mercurio used on the 25th when discussing with Mr. Beauchamp?
A No, not at all. CT Page 5316-XX
Q Okay. What happened next? You left the building?
A He took my badge. I had a few personal items and I left the building.
Q How did you feel as you were walking outside the building?
A I couldn't comprehend what had just occurred. I could not believe — I was emotionally drained. It was a big void. I had never in 25 years seen anything like that, where the only thing was I asked that I be allowed to talk to his superior or someone in Personnel to find out what my status was, and to be walked out like that in from of direct reports, peers of mine, people I saw in the corridor, because we're talking possibly going a thousand feet or better through a corridor after corridor where I encountered a lot of people and I had all of my belongings and being escorted out like that. I was overcome with emotions at the time, but I couldn't comprehend what was happening.
At that, point I did know I was not being taken to Personnel, because —
Q Because you were outside.
A Well, it was just before that, because he was walking me out the back door. Now he's just in effect doing me a favor by walking me towards my car, because, I say, it was definitely winter and may have been raining. I couldn't comprehend what had occurred, or why.
Q Mr. Chieffalo, were you familiar at that time with a procedure which served as a means to make a complaint or address an issue that you had with a coworker or superior at Norden Systems that Norden had in place?
A Yes, I was
Q And how did you become aware of that procedure or policy or practice?
A Well, initially I believe I read it on the bulletin board, but I had — I received something via the interoffice mail because I was a supervisor. CT Page 5316-YY
Q Okay.
CV-92 0127694 S : SUPERIOR COURT
ANTONIO CHIEFFALO : STAMFORD/NORWALK J.D.
VS : AT STAMFORD
NORDEN SYSTEMS, INC. : FEBRUARY 28, 1996
BEFORE:
THE HON. JOHN J.P. RYAN, JUDGE
APPEARANCES:
 STEPHEN J. CONOVER, ESQ. Attorney for the Plaintiff
 CAROLE F. WILDER, ESQ. Attorney for the Defendant
 WENDY D. DICHRISTINA, ESQ. Attorney for the Defendant
 KAREN PACCHIANA Court Monitor
Q Now, Mr. Chieffalo, on the day you were fired —
A Yes.
Q — March 26th, 1992, you described Mr. Mercurio walking you to the exit door.
A Yes.
Q At that time did Mr. Mercurio give you anything or anyone else give you something?
A No.
Q A piece of paper or any document? CT Page 5316-ZZ
A No.
Q Did you have a discussion with anyone other than Mr. Mercurio at the exit door or between the time you left Mr. Mercurio's office to the time you reached the exit door?
A No, no one.
Q Security?
A No.
Q And guards, people at the guardhouse?
A No. I walked by someone in Security as he took my badge.
Q And your badge was your what?
A It was my identification and my means of going into and out of the building. There were security guards there because we were a defense contractor.
Q The badge —
A It identified myself. It had a picture of me, my name, my clock number.
Q Did you ultimately receive an unemployment notice accept?
A No.
Q Okay. You filed for what you expected to receive?
A Yes.
Q And you received everything you —
A Right. And as I said, there was an extension. I didn't request it. I believe that the government extended it by 26 weeks. I was not employed so I qualified.
Q Okay. Could you describe for me how you felt in the days after you were fired from employment? CT Page 5316-AAA
A I was overwhelmed. I really did not know what had occurred.
Q And why were you overwhelmed?
A There was no one to speak to. The manner in which had been abruptly walked out that door, the inability to have a conversation with anyone, and certainly I didn't believe it was justified to be terminated.
Q And did anyone — could you describe for me who saw you being escorted out the door, escorted away in this termination process as firing you described yesterday?
A By name or in total?
Q Well, if you know their names, could you tell us their names?
A I know some of the individuals specifically.
Q And who were they?
A John Kenworthy, Frank Mediate, Ken Brown, Ken Mason, Andrea Casseria, Jerry Beauchamp, Bill Petanicky.
Q They saw you being taken out?
A Yes.
Q And where did they see you?
A Within the office confines.
Q You mean the building or you mean your office?
A Within the building. There was like a large office area. We each had cubicles, so we were all closed into together, in a room such as this, a little bit bigger. There were approximately twenty individuals within that area and I was walked out through there so most of the people that were within their cubicles saw me being escorted.
Q And that's the same cubicle area that you were located in? CT Page 5316-BBB
A Yes.
Q That's the same area that Mr. Mercurio's office is located in?
A Yes.
Q So it's within your department?
A It's within the department. As I say, it, was one large area really in the basement area that had been converted to offices and there were various offices of different, sizes depending on your stature within the department, and then essentially about 22 — 24 cubicles which were really no more than the width of a desk and a little bit of room for two chairs. So all of us were enclosed within that one large area.
Q And the people's names who you just mentioned, who were they?
A Some were co-workers, some were my equals, some were programmer analysts, and approximately four of those individuals reported directly to me.
Q And what department were they in?
A Information Services.
Q Your department?
A My department, Systems Development.
Q And that's why they were geographically in that office area?
A Yes.
Q Could you explain if you've ever felt, the same as you did following your termination, those days following your termination?
A Never. Never.
Q Could you describe how that impacted upon your day-to-day CT Page 5316-CCC life, that, feeling of overwhelm, being overwhelmed as you described?
A As I stated earlier, for approximately five days I was just at a blank, I could not understand what had occurred. I had been through what I considered a tough period in my life during my divorce, but here I just had no opportunity to speak to anyone. I didn't know where to turn, where to go, who to turn to, what should I do next, how could this be happening. I made a phone call. I was waiting for a phone call. Instead I was told — given twenty minutes, told "Clean out your desk, you're being terminated."
Q Could you describe any examples of how that impacted on your day-to-day life following your firing?
A Yes, I was unable to do anything.
Q What do you mean unable to do anything?
A I was not getting dressed, I just stayed in my room contemplating what occurred, trying to relive what had occurred, trying to understand what caused this, what happened.
Q Could you describe whether you considered professional counseling as a result of that?
A I thought about it. I really didn't know who to turn to or where to go.
Q How long did that last, the feeling of being overwhelmed?
A It stayed with me for a very long time. As a matter of fact, I wrote the letter to the peer review and I was anxious, I was anticipating a phone call, even after I was walked out, I said someone's going to find out what occurred, they're going to call me up to find out what happened. The phone call never came, and I waited.
I went to the Unemployment Office. I was told that there would be a hearing, someone from Norden would show up, I would ask them when I could go in for that peer review. No one from Norden ever went to the Unemployment Office. I did not know what was going to happen next. So it was constantly on my mind. There were no answers, no one to speak to. CT Page 5316-DDD
Q Could you describe your efforts to obtain work since
CV92 0127694 S : SUPERIOR COURT
ANTONIO CHIEFFALO : J.D. OF STAMFORD/NORWALK
VS : AT STAMFORD
NORDEN SYSTEMS, INC. : FEBRUARY 29, 1996
BEFORE:
HON. JOHN J.P. RYAN, JUDGE
AND A JURY
GENUARIO AND CONOVER
BY: STEPHEN CONOVER, ESQ.
For the Plaintiff.
DAY, BERRY AND HOWARD
BY: MS. CAROL WILDER, ESQ.
MS. WENDY DECHRISTINA, ESQ.
For the Defendant.
 PATRICIA M. CHRISTIAN, Court Reporter.
MR. CONOVER: Objection, your Honor.
MS. WILDER: You can't tell what you were advised.
THE COURT: What conclusions did you reach?
A The next day I had a meeting which was March 26.
Q Who was present at that meeting?
A I had a meeting, called Tony in, it was just Tony and I, CT Page 5316-EEE and I reiterated Tony either had to buy into this project and take on this assignment or voluntarily resign or I would have to fire him. And I said to him, "Take some time to think about this. This is serious. You have a whole lot of options here. You either have to work the project or leave." And his comment was, "I am not working the project." That was in the morning sometime around nine-ish, I believe, early morning, and he stormed out and with that I called Jane Nelson.
Q Who is Jane Nelson?
A Jane Nelson is also a supervisor in human resources and I explained the situation to Jane.
MR. CONOVER: Objection to what Ms. Nelson says.
Q Can you tell us about the subject matter of your discussion with Ms. Nelson?
A Yes. I explained the situation I had on my hands and she was to call me back.
Q And what happened after that?
A Several hours went by, Mrs. Nelson — Jane called me back and said —
MR. CONOVER: Objection, your Honor.
Q And did you have a conversation with Ms. Nelson when she called you back?
A Yes, I did.
Q And what happened after that based on your conservation with Ms. Nelson?
A I called Mr. Chieffalo back into my office. I said, "Tony, this is real serious. Please think about what's about to happen. If you don't take this assignment I am going to have to fire you." He said, "Do what you have to do." I then said to him, "Well, I will get back to you in a bit." I asked the manager who was in the office next to me to come and be a witness to what was about to happen. Tony came back in, I gave him his options again. CT Page 5316-FFF Again he said, "You have to do what you have to do." I said, "Tony, with that I will ask you to pick up your personal belongings and I am going to have to walk you out." And I gave him some time. He went to his area. I think it was about a half hour later I came by his area. I said, "Are you ready?" He said, "Yes." We walked out and I took his badge, came back to the office and had —
Q Tell me how did you feel at that moment?
A Well, really bad. We were working a long time. There was a lot of people involved with this and we were trying to save Tony. That was the process. The whole thing was to try to get him to turn around, be a team player, be cooperative and here I am walking him out after all these months, which seemed like years of trying to turn him around, and we lost. We all lost. And it was kind of like a big let down. So I got back to my desk and I said —
Q Did you write a memo or notes of the meeting, the termination meeting that you had with Mr. Chieffalo?
A Yes, I did.
Q Showing you this document, Mr. Mercurio, could you identify that, please?
A Yes.
Q Just identify it, don't talk about the contents?
A Yes, that's the document.
Q What is that document?
A It's a recap of the termination, the two days — exactly what I just said.
Q Could you look at the date and tell me when it was written, please?
A March 27.
A 1992?
A Yes. CT Page 5316-GGG
Q And it's in the form of a memo. Who is the memo from and who is the memo to?
A It's from me and it's to Mr. Larry Linskus and Jane Nelson.
 MS. WILDER: At this time I move that this be admitted as a full exhibit. That would be exhibit twenty five. Any objection?
 MR. CONOVER: If your Honor please, to the extent that the document, I guess, has been authenticated in the sense it's a business record and there's an objection to the hearsay exclusionary rule, there is